[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff brings this appeal under Conn. Gen. Stat. Sec. 10-151(f) claiming she was improperly laid off from a tenured teaching position by the defendant.
The administrative record has been filed.
Facts
Marsha Tomlinson was a tenured teacher employed by the Bristol Board of Education as a teacher for twelve years. For the 1989-90 school year, she was employed as a high school English teacher.
In the spring of 1990, the Board eliminated positions in the English departments of the high schools, and after waiting for voluntary quits or retirements, the Administration was left in the English departments of the high schools with more tenured teachers than positions. In the spring of 1990, defendant notified Ms. Tomlinson that she was being considered for termination because of a reduction in the number of teaching positions. She was selected for such consideration based on inverse seniority. Her performance as a teacher was not a factor.
Conn. Gen. Stat. Sec. 10-151(d) permits the Board to cut positions and terminate the affected teachers, including those with tenure "in accordance with . . . a provision for layoff procedure agreed upon by the board of education and the exclusive employees' representative organization."
In Bristol, the exclusive employees representative is the Bristol Federation of Teachers, Local 1484, American Federation of Teachers, AFL-CIO ("Union").
Defendant and the Union entered into an Agreement dated July 1, 1989 ("Agreement") which was in effect during the relevant period. CT Page 6715
The layoff procedure agreed upon by the defendant and the Union uses seniority as "the determining factor." Article 34:4.2 of the Agreement is in pertinent part as follows:
 Seniority shall be the determining factor in layoffs and involuntary transfers caused by layoffs (or to avoid layoffs) * * *. (Joint Exhibit 1).
At the time of the hearing, plaintiff was the least senior high school English teacher, but for two tenured high school English teachers who had less seniority. Neither of those were selected for layoff because each one teaches in a special program; one called Project Pride and one Alternative Education ("Special Programs").
By agreement between the defendant and the Union, tenured teachers in the Special Programs are protected from layoff, in order to preserve continuity and protect the programs from disruption. Under the Project Pride agreement, teachers who were selected were required to remain in the program for three years as a condition of entry.
The agreements protecting teachers in the Special Programs ("Special Agreements") from the normal rules governing layoffs were negotiated by a negotiation team for the defendant and a negotiation team for the Union. Those agreements were signed by the chairman of the defendant board and the president of the Union. The "Agreement Concerning Alternative Education" was signed on April 19, 1990 by "James G. Doyle, President, Bristol Federation of Teachers" and on April 20, 1990 by "Richard Guerriere, Chairman, Bristol Board of Education." The "Agreements Concerning Project Pride, April 1990, Bristol Federation of Teachers Local 1464, CSFT, AFT, AFL-CIO and Bristol (CT) Board of Education" were signed by the same two individuals on the same dates as the "Alternative Education" agreement.
Each of those agreements suspended the Collective Bargaining Agreement's seniority system by virtue of the following language:
 Project Pride: "Persons selected for Project Pride shall remain in the program and shall not be subject to layoff or involuntary transfer for the period of time that the pilot exists."
CT Page 6716
 Alternative Education: "Effective with the school year 1990-1991, persons selected for the Alternative Education Program shall remain in their positions and shall not be subject to layoff or involuntary transfers caused by layoffs or to avoid layoffs."
The defendant's negotiators reasonably believed that the negotiators on the Union side had the authority to negotiate, to agree, and to sign the two agreements. The defendant's negotiators, acting in good faith, negotiated with Union officials, reached agreements with them, reduced the agreements to writing, and completed the process by having the agreements signed by the Board Chairman and Union President.
The Special Programs are programs to help children with special needs. The Panel found that the agreements were not entered into to get rid of plaintiff. The purpose of waiving the seniority rules was to prevent disruption to the Special Programs by assuring that the teachers in them would not be laid off, or bumped out by other displaced teachers bumping in. This was based on the educational judgment that the importance of the Special Programs required teachers to stay in the programs.
William F. White ("White"), a member of the Board negotiation team, had significant prior experience negotiating with the Union. The Union was represented in these negotiations by Mr. James Doyle (Union President for 20 years) ("Doyle"), Mrs. Barbara Doyle (Union Secretary) ("Secretary"), Mrs. Nancy Dennehey (Union Treasurer) ("Treasurer"), Frank Drobek (Union First Vice President ("Vice President"), and Barbara Driscoll (Union Steward and Member, Executive Council ("Steward"), who were all either Union officers or members of the executive council. White could not recall dealing with anyone else but these persons during past negotiations. It was customary for agreements to be signed by Doyle on behalf of the Union and by Mr. Guerriere on behalf of the Board.
The Union and the Board representatives met numerous times over several months before reaching agreement and the negotiators met in the latter part of September 1989; January 16, 1990; January 30, 1990 and March 29, 1990 before reaching agreement on all items. The Union included the "superseniority" provisions of the Project Pride agreement as a part of its proposal at the beginning of negotiations. The Board's negotiators sought inclusion of a similar provision in the Alternative Education agreement in January, 1990. CT Page 6717
The final document was produced by the Union, submitted to the Administration for review, and to the Board for its approval. The agreements were signed April 20, 1990. It then appeared that some layoffs were probable.
Mrs. Hurd, who has some years of seniority but less than plaintiff, had been in Alternative Education for at least one year. Because of the addition of the superseniority provision, she had to reapply for the position. Plaintiff applied for the Alternative Education Program, but withdrew her application and was not considered.
There was no evidence, that anyone told the Board, their negotiators or agents before or during bargaining or at the signing that the special agreement they negotiated was not valid or binding until ratified by either the Union executive Board or the Union membership, or by both, or any other body. There was no evidence that anyone told the Board, their negotiators or agents before, during bargaining or at the signing that the Union negotiators did not have the power to negotiate, or the power to agree, or the power to sign. The Board, the Board negotiators and the Administration proceeded in the good faith belief that they were dealing with representatives who had authority to begin negotiation, to conclude negotiations, and to sign binding agreements.
The special agreements were negotiated in accordance with Article 2, Section 2.2 of the collective bargaining agreement between the Board and the Union, which provides: "This contract shall not be changed except by the mutual consent of both parties. Such mutually consented change shall be in writing."
The plaintiff was notified on July 12, 1990, that the Board was considering terminating her contract due to a reduction in force. A statement was given to her about her termination. She then requested a public hearing before an impartial panel and the parties agreed to have a hearing before a single impartial panel member, Peter Adomeit (the "Panel"), under a waiver of the statutory time limit for commencement of the hearing.
The Panel held a hearing on August 31, 1990. The Panel issued a written evidentiary ruling on October 2, 1990 denying plaintiff's request to offer testimony to try to establish that the Union representatives who negotiated Administration Exhibits 1 and 2 lacked actual authority. A final hearing was held October 19, 1990 and the parties submitted final briefs on November 2, 1990. The Panel issued a written opinion on January 6, 1991 concluding that plaintiff was lawfully CT Page 6718 selected to be the high school English teacher to be laid off pursuant to Conn. Gen. Stat. Sec. 10-151(d).
The Panel rejected plaintiff's claims that the Board had breached the Project Pride agreement by not creating two positions and that the Board was improperly using tutors in teaching positions.
On January 14, 1991, the Board held a public hearing to determine whether it should accept or reject the findings of the Panel and reviewed and discussed the issue. By a vote of 6 to 2, the Board accepted the recommendation of the Panel that the contract of employment of plaintiff be terminated, effective immediately and plaintiff was given written notice on January 16, 1991.
Before the Board meeting of January 14, 1991, each Board member knew that the two Special Agreements had not received membership approval.
The court has taken judicial notice of the case of Tomlinson v. Bristol Federation of Teachers, Local 1484; American Federation of Teachers, AFL-CIO; and James G. Doyle, Hartford/New Britain Judicial District at New Britain, No. 446628.
The Panel and defendant knew as early as August 31, 1991, that plaintiff claimed and sought to prove that Doyle had no actual authority to bind the Union to the two Special Agreements. If that fact had been allowed into evidence, the Panel would then have had to consider whether receipt of that knowledge by the Board after execution of the two agreements but before plaintiff's layoff was relevant.
Both Special Agreements were fully executed and in effect on April 20, 1990.
The court does not know whether or not the rights of any other person were affected by one or both of those agreements between April 20, 1990 and August 31, 1990. However, the Project Pride Agreement waived the collective bargaining agreement seniority rules for one teacher, Kolesinsky, thru 1993 and the Alternative Education Agreement waived those rules for one teacher, Hurd, thru at least 1991. As to Hurd, the entire matter appears to be moot.
"The reason the Administration did not follow the Collective Bargaining Agreement as written is because they [sic] and the representives of the Union agreed in writing to suspended [sic] it." Panel's ruling dated October 2, 1990, page 7. CT Page 6719
". . . Mrs. Tomlinson would still be employed were it not for the modification of the formal Collective Bargaining Agreement. Id. 13.
Mrs. Tomlinson's seniority rights were protected by that "formal Collective Bargaining Agreement." They may still be if no legal act ever modified that agreement.
This case is not between plaintiff and the Union. It is only about the defendant's right to ignore its contract obligation to plaintiff.
Plaintiff is a teacher. Teachers have contracts. Conn. Gen. Stat. Sec. 10-151(c) and (d). Such contracts are automatically continued from year to year after the teacher has attained tenure. Id.
The only reason that the defendant gave for firing the plaintiff is ". . . contained in Section 10-151(d)(5) of the Connecticut General Statutes: ". . . elimination of the position to which the teacher was appointed or loss of a position to another teacher, if no other position exists to which the teacher may be appointed if qualified . . ." That power to terminate a tenured teacher's contract is limited by that same statute which provides that defendant may terminate such a contract for a teacher in plaintiff's posture "in accordance with either (A) a provision for a layoff procedure agreed upon by the board of education and the exclusive employee's representative or (B) in the absence of such agreement, a written policy of the board of education; . . ." No one claims this termination was under a written board policy and thus it is subject to the "layoff procedure agreed upon by the board . . . and the Union."
The only such procedure agreed upon is found in the Agreement. That procedure was not followed. However, defendant says that procedure was modified by the "Special Agreements".
The court has read the Agreement with care and finds nothing in it that would tell the board that, a) it either was ratified or was to be ratified by a vote of the Union membership or b) that any amendments to it would have to be so ratified. The Special Agreements did modify the Agreement. Doyle had the apparent authority to execute both. His action was never repudiated by the Union or any board or committee of it. Cohen v. Holloway's, Inc., 158 Conn. 395, 407-408.
Appeal dismissed. CT Page 6720
NORRIS L. O'NEILL JUDGE, SUPERIOR COURT